IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Packaging Corporation of America, Inc., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| Patrick Croner, an Indiana citizen, | ) ) | |
| Defendant. | ) | |

## COMPLAINT

Packaging Corporation of America, Inc. ("PCA"), by its undersigned counsel, complains against Patrick Croner as follows:

## NATURE OF THE CASE

1. This case presents an emergency concerning confidential information, trade secrets and a narrow customer non-solicit agreement involving a long-serving PCA employee (12 years) named Patrick Croner ("Croner") who voluntarily resigned on Monday May 6, 2019, to accept a directly competitive position with Welch Packaging ("Welch"), a competitor of PCA, as Welch's Executive Vice President of Business Development, where he appears to be doing the exact same thing for Welch that he did for PCA, including because he is calling upon his PCA customers to try and displace PCA as the supplier of their corrugated cardboard packaging needs. This is a round trip for Croner back to an employer he once worked for. As explained in greater detail below,

    (a)    Croner historically worked at Welch, where he signed an employee agreement containing certain restrictive covenants.

    (b)    He resigned from Welch in July 2007 to accept a position with a Welch competitor called Field Packaging. At Field Packaging, Croner signed a new employee agreement, wherein he agreed to honor his restrictive-covenant

1

<p style="padding-left: 40px">obligations back to Welch, <u>and</u> agreed to new such restrictions for Field Packaging's benefit.</p>

<p style="padding-left: 40px">We make the point about Croner agreeing to honor Welch's historical covenant for 18 months, which admittedly was years ago from July of 2007 through January of 2009 and which is <u>not</u> at issue in this case, to illustrate that this is an area of the law Croner is familiar with, and which concerns restrictions of a kind that he previously agreed to honor when he moved to Field Packaging.</p>

(c) In 2011, Plaintiff PCA acquired Field Packaging by way of a corporate merger, thereby acquiring the rights and obligations set forth in Field Packaging's agreement with Croner, including the right to enforce the terms thereof against Croner should he leave PCA's employ to work for a PCA competitor. Hereinafter we refer to this agreement as the "PCA Customer Restrictive Covenant." Croner's job title and responsibilities for PCA were the same as, or substantially similar to, those that he had with Field Packaging prior to the merger.

2. PCA is now learning that Defendant Croner already is beginning to solicit and call upon his former PCA customers to try and steal their business away from PCA in violation of the PCA Customer Restrictive Covenant. Given that Croner previously agreed to honor Welch's restrictions when he went to work for Field Packaging in 2007, which means that Croner is no stranger to the law applicable to agreements such as the PCA Customer Restrictive Covenant, it is a mystery as to why he is flagrantly violating his current agreement.

3. Notably, the PCA Customer Restrictive Covenant does not preclude Croner from working for a competitor such as Welch, nor does it even preclude him from calling upon those customers which he brought to the employment relationship when he moved from Welch to Field Packaging (who were not already PCA customers). Rather, the applicable customer restriction only prevents him for 12 months from soliciting or servicing the PCA customers he otherwise began servicing while at PCA.

4. Croner also agreed in the Customer Restrictive Covenant to maintain the confidentiality of PCA's confidential information, and that he would return all such information to PCA upon his resignation. Despite working for PCA (and Field Packaging) for 12 years,

Croner has yet to return even a single piece of paper or one electronic file back to the company. Having been the face of PCA to the customers described below, and as PCA is now aware that he has begun soliciting those customers, on information and belief including because he has not returned any paper or electronic files of any kind, Croner is using, or inevitably will use, PCA's confidential information and trade secrets for himself and against PCA. As set forth below this information includes (a) the customers' individual preferences (such as what is purchased, when those cycles come up, delivery needs, and at what cost) and (b) PCA's internal process for developing the price to charge its customers.

5. Accordingly, PCA brings this complaint to protect its legitimate business interests, and necessarily must request certain emergency, preliminary and other relief.

## THE PARTIES

6. PCA is a Delaware corporation with its principal place of business in Lake Forest, Illinois.

7. Croner is a citizen of the state of Indiana, living in Munster, Lake County, Indiana.

## JURISDICTION AND VENUE

8. This Court has original federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over this matter because PCA pleads a claim pursuant to the Federal Defend Trade Secrets Act ("DTSA"), which expressly authorizes original claims in the federal district courts at 18 U.S.C. § 1836(c).

9. This Court also has subject matter jurisdiction over this dispute based upon the principles of diversity set forth at 28 U.S.C. § 1332 because PCA and Croner are citizens of different states and the amount in controversy exceeds $75,000 because, among other reasons,

64593.4

(a) the confidential information and trade secrets at issue are worth more than $75,000, and (b) the PCA customers at issue and subject to the restrictive covenant at issue account for more than $75,000 in annual revenue to PCA.

10. This Court also has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 over the state claims alleged herein because those claims are related to the federal DTSA claim and form part of the same case or controversy.

11. Croner is subject to specific personal jurisdiction in this Court because this lawsuit arises out of a contract he made with an Illinois citizen, the transaction of business related thereto directed towards and located in Illinois, Croner's breach of that agreement directed towards Illinois which has caused damage on an Illinois citizen in Illinois, Croner's violation of state and federal trade secrets law directed towards Illinois and which has caused damage to a citizen of Illinois, and Croner's commission of other tortious acts in or directed towards Illinois. Moreover, Croner routinely and regularly visited and traveled in Illinois in his work for PCA and this lawsuit arises, in part, out of those jurisdictional actions.

12. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) & (3) because, among other reasons, a substantial part of the events or omissions giving rise to the claims occurred in this venue, and Croner is subject to personal jurisdiction in this venue.

## BACKGROUND

### Plaintiff's Business And Hiring of Defendant Croner

13. PCA is one of the top four producers of containerboard products and uncoated freesheet (paper that contains little to no ground wood) in North America. It operates multiple such mills, and has nearly 100 corrugated products manufacturing plants (which tend to be located close to customers in order to decrease the freight costs associated with shipping PCA's

products to its customers and, accordingly, PCA also competes with smaller regional producers). It is headquartered in Lake Forest, Illinois and operates primarily in the United States. Its related products include a wide variety of corrugated packaging products (which are used as conventional shipping containers to protect and transport manufactured goods, multi-color boxes and displays with visual appeal to help merchandise packaged products in retail locations, and honeycomb protective packaging). It also manufactures packing for meat, fresh fruit and vegetables, processed food, beverages, and other industrial and consumer products. PCA sells its products, in part, through direct sales and Defendant Croner was one such sales person.

14. Competition between PCA and its competitors, including Welch, is intense. PCA and its competitors expend significant resources gathering customer data and establishing meaningful contact with customers and potential customers in the hopes that those efforts will result in valuable, long-term and near-permanent relationships. Because of the nature of competition in the industry, each company closely guards the data it gathers on its actual and prospective customers.

15. Croner actually used to work for Welch, and he came to be a PCA employee by way of PCA's acquisition of the packaging company he worked for after Welch, a company called Field Packaging Group, LLC ("Field Packaging"). In short explanation, prior to July of 2007 Croner worked for Welch as a sales person for corrugated cardboard products where he was responsible for sales to customers, and the management of those customer relationships. By July 31, 2007, Croner left Welch to accept the position with Field Packaging in sales where, again, he primarily dealt with the sale of corrugated boxes.

64593.4

16. When he accepted the position with Field Packaging he signed the PCA Customer Restrictive Covenant – an employee agreement containing, among other things, confidentiality and customer non-solicit obligations, a true and correct copy of which is attached hereto as Exhibit 1 (as set forth in the next section of this complaint, PCA legally is entitled to enforce the Agreement because of a corporate merger).

17. The PCA Customer Restrictive Covenant acknowledges that Croner had signed a prior employee agreement with Welch. The Welch agreement actually contained more restrictive customer restrictions than the ones at issue in this matter, and Croner agreed to honor those during his new employment at Field Packaging. *See* Ex. 1 ¶ 3(d), where he agreed that for 18 months he would not solicit Welch customers he had solicited for Welch, and for 12 months that he would not sell products to other of Welch's customers, in each instance on behalf of Field Packaging. Croner further agreed to maintain the confidentiality of Welch's confidential information and trade secrets. *Id.* ¶ 3(d)(2). Given his prior willingness to honor such restrictions, there is no good reason for him to refuse to honor the less restrictive covenants at issue in this case which arise from the PCA Customer Restrictive Covenant.

## PCA Acquires Field Packaging

17. On April 14, 2011, pursuant to an equity transaction, PCA acquired Field Packaging and Croner then became an employee of PCA, continuing in the same role that he had been serving for Field Packaging prior to the transaction. The PCA Customer Restrictive Covenant, Exhibit 1, was one of the material contracts that PCA specifically acquired in the transaction as set forth in Schedule 3.15 to the deal agreement and, regardless, the PCA Customer Restrictive Covenant became a contract that PCA has the right to enforce by operation of established Illinois corporate law specifically concerning employee restrictive

6

64593.4

covenants. *See, e.g., Hexacomb Corp. v. GTW Enterprises, Inc.*, 875 F.Supp 457, 464-66 (N.D. Ill. 1993). Thus, PCA now stands in Field Packaging's shoes and it legally is entitled to enforce the PCA Customer Restrictive Covenant against Croner. Such is an axiomatic result of basic corporate law: PCA is entitled to protect the business and good will that it acquired when it purchased Field Packaging. Were the law otherwise, all of American corporate law would be turned on its head.

<p align="center">Croner's Work For, And Obligations To, PCA</p>

18. Croner's job at PCA was a continuation of his duties from before the merger. His duties as a salesperson of corrugated boxes were to generate new business from all customer accounts for which he was responsible, and to manage those ongoing relationships.

19. Croner was the face of PCA to the customers for which he was responsible. Utilizing PCA resources he would regularly meet with and entertain customers and prospective customers alike, including through use of sports tickets for Chicago-area sporting events.

20. Because of these responsibilities, at the time of his resignation Croner had regular and systematic contact with approximately sixty-five (65) long-term, near-permanent PCA customers ("Restricted Customers") whose business PCA has grown over the years. Each of the Restricted Customers has done business with PCA in the past 24 months. In the past two years, PCA's revenues from these Restricted Customers exceeded $26 million. Croner made more than $1 million in 2018 for his work at PCA in this regard. These Restricted Customers do not include any relationships Croner brought to the employment relationship.

21. Croner acknowledged in the PCA Customer Restrictive Covenant that he would gain "close knowledge of and possible influence over [PCA's] customers . . . , and will in such

capacity possess the goodwill of [PCA], and that this Agreement is necessary to protect [PCA] against unfair loss of said customers, employees or goodwill." Ex 1. p. 1.

22. He further agreed to keep certain information confidential, including PCA's customers, PCA's ways of doing business, purchasing information, price sheets, proposals, and other technical information. *Id.* ¶ 2. He agreed that if he ever left PCA's employ, he would return all such information to the company. *Id.*

23. With respect to the post-employment solicitation of customers, the applicable restriction applied only if Croner voluntarily terminated his employment. *Id.* ¶ 3(b)(1). The restriction provides that Croner will not:

> for the twelve (12) month period following his termination directly or indirectly solicit, service, have contact with, or divert any entity which is, as of the time of the termination of [his] employment or the immediate twenty-four (24) month period prior to such termination, a customer of the Company or prospective customer with whom [he] had prior dealings or who were customers of the Company about whom [Croner] learned as a result of his employment or through confidential, proprietary or trade secret information of the Company.

*Id.* ¶ 3(b)(i).

24. The agreement permits Croner to work for a competitor in a similar or dissimilar role, and even permits him to call upon those customers that he had a relationship with when he became a PCA employee (via Field Packaging, back in 2007). *Id.* This is in addition to the further limitation that the restrictions would not apply at all if PCA had terminated his employment without good reason. *Id.* ¶ 3(b)(i).

25. Croner acknowledged that the terms in the PCA Customer Restrictive Covenant are reasonable and necessary to preserve and protect the business interests of PCA, its current and potential business activities and the economic benefits therefrom. *Id.* at ¶ 3. He further

agreed that enforcement of the restrictions will not prevent him from earning a livelihood in his chosen business and are not an undue restraint on him. *Id.* at ¶ 2.

26. Croner acknowledged that violation of these restrictions would cause PCA irreparable harm for which monetary damages alone would be difficult or impossible to calculate and would, further, fail to provide an adequate remedy. *Id.* ¶ 4. Accordingly, he agreed that actual or threatened violation is properly addressed with injunctive relief. *Id.*

27. The PCA Customer Restrictive Covenant contains an Illinois choice-of-law clause and, thus, is subject to Illinois law. *Id.* at ¶ 9.

28. PCA's customer relationships are long-term, near-permanent, and are critical to PCA's continued business and represent legitimate business interests. In developing and expanding the Restricted Customer relationships for which he was responsible, Croner relied upon and used PCA's resources, employees, confidential information, and trade secrets. Further, Croner retained 100% of the commission made on each of the Restricted Customers, except in a few instances where the commissions are shared with another sales person from another manufacturing plant.

<p align="center">PCA's Confidential Information and Trade Secrets</p>

29. In order to perform his job responsibilities, Croner was given access to confidential information and trade secrets ("PCA's Confidential Information and Trade Secrets").

30. PCA' Confidential Information and Trade Secrets at issue in this action include: the identities of its customers, including PCA's pipeline of prospects thereof, those customers' unique preferences, specifications and buying and selling histories, and PCA's internal processes for the pricing it ultimately charges its customers. If a competitor knew PCA's

internal costing process, it would know how to price against PCA in any competitive transaction. In addition, with respect to pricing formulas, PCA spends a considerable amount of time and money analyzing business history and data in order to generate such formulas. PCA's data regarding pricing is also critical to its position in the marketplace, and it protects this information from disclosure.

31. PCA has taken reasonable measures to keep secret its Confidential Information and Trade Secrets including by requiring employees with access to such information to sign confidentiality agreements, requiring its employees to re-certify their acceptance thereof on a regular basis, requiring its employees to adhere to PCA's Statement of Business Principles (which includes obligations regarding confidentiality), by password protecting its computer systems, and by limiting disclosure of such information only to those with a need to know it.

32. None of the above information is available to PCA's competitors through lawful means, and PCA derives a competitive advantage from the confidentiality of such information.

33. Indeed, this information, which PCA paid Croner to acquire, accumulate, and assemble over years with considerable time, expense, and effort, is protected by PCA and is not otherwise available to the general public or known in the packaging industry in this same usable form. Such information would be difficult to duplicate and would be valuable to a competitor looking to compete for the business of PCA's customers and suppliers.

34. PCA's Confidential Information and Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable though proper means by, another person who can obtain economic value from the disclosure or use of the information.

64593.4

35. As a result, the Trade Secrets identified herein constitute trade secrets and/or confidential information that, if wrongfully obtained and used by one of PCA' competitors, would cause PCA to suffer irreparable harm.

<u>Croner's Abrupt Resignation and Following Bad Conduct</u>

36. On May 6, 2019, Croner abruptly tendered his resignation to PCA. He has continued to refuse to speak with his general manager.

37. Since learning of the fact of his employment with a direct competitor, PCA has now learned that Croner has begun soliciting the Restricted Customers to try and get them to do business with Welch. For example, PCA already is aware that Croner has sought to schedule sales meetings with one or more Restricted Customers, including specifically Luster Products. PCA also is aware from certain of the Restricted Customers that Croner advised them that he was leaving PCA before he even tendered his resignation to PCA. A fair inference is that Croner first told the Restricted Customers because he was planning to solicit them for Welch before and after he resigned. On information and belief, including because Croner has not returned any information to PCA, Croner is using PCA's Confidential Information and Trade Secrets in connection with these solicitations.

38. In addition to Croner's actual and threatened misuse, disclosure and misappropriation of PCA's Confidential Information and Trade Secrets, it also is inevitable that he will misappropriate PCA's Trade Secrets if he is permitted to continue operating in violation of the Restrictive Covenant given his prior position with PCA, the identity and similarity of his new position with Welch, and the fact that he is soliciting the Restricted Customers he served for PCA.

<u>Damage Allegations</u>

64593.4

39. Each of the acts and omissions alleged herein singularly or in combination with others, as described and identified herein, constitute a misappropriation of confidential information and trade secrets, unfair competition, breach of contract, tortious interference with contracts and prospective business relations, and/or other wrongful conduct that proximately has caused or will cause PCA to suffer damages. As a proximate result of Croner's conduct set forth herein, PCA will suffer significant damages and face significant damages in the future, both as measured by lost sales and the revelation of their Confidential Information.

40. Croner's conduct as set forth herein shows willful, wanton, and outrageous misconduct, and an entire want of care that raises a presumption of conscious indifference to consequences. Croner acted with a specific intent to harm PCA. Accordingly, PCA will seek the imposition of punitive damages if the matter progresses to that stage.

41. As a direct and proximate result of Croner's conduct described above, the total potential losses to PCA cannot be accurately measured. Furthermore, unless Croner is enjoined as requested herein, PCA will suffer further irreparable harm, to which it has no adequate remedy at law. Croner has no legitimate interest in engaging in such egregious misconduct.

42. If Croner is permitted to continue the wrongs described herein, he will have profited from his wrongs, resulting in immeasurable damages to PCA that are unpredictable, uncertain, and unending. Unless restrained as requested herein, there also exists substantial risk that Croner will be unable to answer in money damages.

43. Unless Croner is enjoined from further breaches, and enjoined from use of PCA's Confidential Information and Trade Secrets, PCA will be irreparably harmed by, among other things, (i) a loss of customers, (ii) a loss of confidential and proprietary information, loss of confidence and trust of customers, loss of good will, and loss of business reputation; and (iii)

64593.4

present economic loss, which is uncertain at this time, and future economic loss, which is presently incalculable.

44. The balance of the equities requires the issuance of a temporary restraining order, which is necessary to maintain the status quo. The granting of injunctive relief will restore the parties to the status quo as it existed immediately prior to Croner's wrongful conduct.

45. PCA will suffer far greater harm if the Court were to deny temporary injunctive relief, as compared to the harm that Croner would suffer if the Court grants such relief. Additionally, a temporary restraining order or preliminary injunction would not substantially harm Croner. The injunctive relief PCA seek is reasonably suited to abate the wrongful activity described herein.

46. The activity that PCA seek to restrain is actionable, its right to relief is clear, and the wrong is manifest. PCA is likely to prevail on the merits of its claims against Croner.

47. A temporary restraining order or preliminary injunction would not harm the public interest.

## COUNT I

### THE DEFEND TRADE SECRETS ACT – 18 U.S.C. §§ 1831-39

48. PCA repeats and realleges the allegations set forth in paragraphs 1 through 47 above as if fully set forth herein.

49. The Trade Secrets identified herein relate to a product or service that PCA uses in, or intend to use in, interstate or foreign commerce.

50. The Trade Secrets identified herein represent protectable trade secrets under the Defend Trade Secrets Act.

51. PCA has taken reasonable measures to keep its Trade Secrets confidential including, but not limited to, because Croner was subject to confidentiality and restrictive covenant terms in a written agreement. PCA has incurred and continues to incur great expense in both time and money to develop and protect the secrecy of its Trade Secrets. PCA's Trade Secrets enable it to compete in a specialized and highly competitive market. PCA has the right to the use and enjoyment of its Trade Secrets.

52. The Trade Secrets are valuable to PCA's business. PCA derives independent economic value from the Trade Secrets, actual or potential, from the fact that they are not generally known to, and are not readily ascertainable through proper means by another person who can obtain economic value from their disclosure or use.

53. Croner has misappropriated PCA's trade secrets because, among other reasons, he (a) acquired the Trade Secrets while knowing or having reason to know that he was doing so by improper means when he has not returned any information to PCA since resigning, and (b) has disclosed or inevitably soon will disclose them without PCA's consent. Croner has a duty to maintain the confidentiality of the Trade Secrets he learned from PCA while working for it.

54. PCA faces threatened and actual immediate and long-term, irreparable harm for which there is no adequate remedy at law if Croner is not temporarily, preliminarily and permanently enjoined from misappropriating, or threatening to misappropriate, PCA's Trade Secrets.

55. As a direct and proximate result of Croner's threatened, actual or inevitable misappropriation, PCA will suffer damages, including, but not limited to, an irreparable and incalculable loss of business, harm to its business reputation and loss of goodwill with its customers.

WHEREFORE, PCA respectfully requests that the Court enter judgment in its favor and grant it the following relief:

1. a temporary restraining order, preliminary injunction, and permanent injunction, restraining Defendant Croner from:

   a. disclosing and further misappropriating PCA' Confidential Information and Trade Secrets; and

   b. directly or indirectly soliciting, servicing, having contact with, or diverting any of (i) PCA's Restricted Customers, or (ii) any prospective customers that Croner learned about as a result of his employment or through PCA's Confidential Information and Trade Secrets, in each instance for the duration of the PCA Customer Restrictive Covenant;

2. An order awarding PCA any damages it can quantify;

3. An award of punitive damages in an amount to be determined at trial;

4. An award of PCA' attorneys' fees and litigation costs; and

5. Such further relief as is just and appropriate under the circumstances.

## COUNT II

**BREACH OF CONTRACT – THE PCA CUSTOMER RESTRICTIVE COVENANT**

56. PCA repeats and realleges the allegations set forth in paragraphs 1 through 47 above as if fully set forth herein.

57. The PCA Customer Restrictive Covenant is an enforceable contract and was supported by consideration. PCA has performed all of its obligations thereunder.

64593.4

58. The restrictions therein are to protect PCA's legitimate business interests including its long-term customer relationships, confidential information and trade secrets, goodwill, and other valid and legitimate business interests. The restrictions are reasonably necessary for PCA's protection.

59. The restrictions are reasonably and narrowly tailored to protect PCA's legitimate business interests. The restrictions are reasonably limited in duration and geographic scope.

60. Despite the contractual prohibitions Croner agreed to, he has materially violated the same, and his violations have been knowing, willing, and voluntary.

61. As a result of Croner's actions, PCA reasonably anticipates the loss of business and goodwill with its customers, substantial, yet largely incalculable and irreparable, loss of revenues, and the sharing of its otherwise Confidential Information which will damage PCA's ability to fairly compete in the marketplace.

WHEREFORE, PCA respectfully requests that the Court enter judgment in its favor and grant it the following relief:

1. a temporary restraining order, preliminary injunction, and permanent injunction, restraining Defendant Croner from:

    a. disclosing and further misappropriating PCA' Confidential Information and Trade Secrets; and

    b. directly or indirectly soliciting, servicing, having contact with, or diverting any of (i) PCA's Restricted Customers, or (ii) any prospective customers that Croner learned about as a result of his employment or through PCA's Confidential Information and Trade

64593.4

        Secrets, in each instance for the duration of the PCA Customer Restrictive Covenant;

2. An order awarding PCA any damages it can quantify;

3. An award of punitive damages in an amount to be determined at trial;

4. An award of PCA' attorneys' fees and litigation costs; and

5. Such further relief as is just and appropriate under the circumstances.

## COUNT III

## THE ILLINOIS TRADE SECRETS ACT – 765 ILCS 1065/1 - 9

62. PCA repeats and realleges the allegations set forth in paragraphs 1 through 47 above as if fully set forth herein.

63. The Trade Secrets identified herein represent protectable trade secrets under Illinois law.

64. PCA has taken reasonable measure to keep the Trade Secrets confidential including, but not limited to, because Croner was subject to confidentiality and restrictive covenant terms in a written agreement. PCA has incurred and continues to incur great expense in both time and money to develop and protect the secrecy of its Trade Secrets. PCA's Trade Secrets enable it to compete in a specialized and highly competitive market. PCA has the right to the use and enjoyment of its Trade Secrets.

65. The Trade Secrets are valuable to PCA's business. PCA derives independent economic value from the Trade Secrets, actual or potential, from the fact that they are not generally known to, and are not readily ascertainable through proper means by another person who can obtain economic value from their disclosure or use.

17

66. Croner has misappropriated PCA's trade secrets because, among other reasons, he (a) acquired the Trade Secrets while knowing or having reason to know that he was doing so by improper means when he has not returned any information to PCA since resigning, and (b) has disclosed or inevitably soon will disclose them without PCA's consent. Croner has a duty to maintain the confidentiality of the Trade Secrets he learned from PCA while working for it.

67. PCA faces threatened and actual immediate and long-term, irreparable harm for which there is no adequate remedy at law if Croner is not temporarily, preliminarily and permanently enjoined from misappropriating, or threatening to misappropriate, PCA's Trade Secrets.

68. As a direct and proximate result of Croner's threatened, actual or inevitable misappropriation, PCA will suffer damages, including, but not limited to, an irreparable and incalculable loss of business, harm to its business reputation and loss of goodwill with its customers.

WHEREFORE, PCA respectfully requests that the Court enter judgment in its favor and grant it the following relief:

1. a temporary restraining order, preliminary injunction, and permanent injunction, restraining Defendant Croner from:

    a. disclosing and further misappropriating PCA' Confidential Information and Trade Secrets; and

    b. directly or indirectly soliciting, servicing, having contact with, or diverting any of (i) PCA's Restricted Customers, or (ii) any prospective customers that Croner learned about as a result of his employment or through PCA's Confidential Information and Trade

    Secrets, in each instance for the duration of the PCA Customer

    Restrictive Covenant;

2.  An order awarding PCA any damages it can quantify;

3.  An award of punitive damages in an amount to be determined at trial;

4.  An award of PCA' attorneys' fees and litigation costs; and

5.  Such further relief as is just and appropriate under the circumstances.


Dated: May 15, 2019          Packaging Corporation of America, Inc.

               By:   /s/ Douglas A. Albritton

                 Douglas A. Albritton (ARDC 6228734)
                 Jeffrey M. Hansen (ARDC 6269900)
                 Michele V. Novelli (ARDC 6330216)
                 ActuateLaw, LLC
                 641 West Lake Street, 5th Floor
                 Chicago, Illinois 60661
                 (312) 579-3131
                 doug.albritton@actuatelaw.com
                 jeff.hansen@actuatelaw.com
                 michele.novelli@actuatelaw.com

64593.4