**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PACKAGING CORPORATION OF AMERICA, INC. | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-CV-03286 |
| | ) | |
| PATRICK CRONER, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Packaging Corporation of America, Inc. ("PCA") filed this lawsuit alleging that defendant Patrick "Buzz" Croner violated The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*, and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, and breached his employment contract when he went to work for a competitor and began soliciting the same clients. Croner subsequently filed a partial motion to dismiss the trade secret counts for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6). The Court grants the motion and dismisses Counts I and III of the complaint with prejudice. PCA also filed a motion for a preliminary injunction seeking to restrain Croner from disclosing or misappropriating trade secrets as well as soliciting a subset of PCA customers per a non-solicitation clause of Croner's employment contract. That motion is denied with respect to the remaining breach of contract claim.

## BACKGROUND

The parties do not dispute many of the key facts in this case.[1] PCA is one of the nation's biggest producers of containerboard products and uncoated freesheet. Croner began his career as

---

[1] In evaluating Croner's motion to dismiss, the facts alleged in the complaint are taken as true, while findings relevant to the preliminary injunction motion are based on the evidence

a salesman in the corrugated box industry in 2005 at Welch Packaging, a direct competitor of PCA (though significantly smaller). As part of his employment contract with Welch, Croner signed a non-solicitation agreement restricting contact with customers for 18 months should he leave the company. In July 2007, Croner accepted a sales position at Field Packaging Group, LLC, at which point he signed another restrictive covenant, this time limiting the customers he could solicit during the first 12 months after departing Field.

On April 14, 2011, PCA acquired Field. In the aftermath of the sale, Croner reached out to a PCA executive to express concern over the acquisition's effect on the scope of the restrictive covenant he had previously signed with Field. Def.'s Mem. in Opp.'n to Mot. for Prelim. Inj. 9, ECF No. 70. Croner maintains that the PCA executive told him that PCA does not do those types of agreements. *Id.* Years later, in 2018, Croner inquired again about the validity of the agreement to PCA management, who responded that PCA inherited the contract as part of its purchase of Field and that it "wouldn't be inclined" to execute a new agreement with Croner. Def.'s Mem. in Opp.'n to Mot. for Prelim. Inj. Ex. E: 9. A month later, Croner asked two other PCA managers about the clause and alleges that they did not respond in writing, but that they agreed with him orally that the agreement would not hold up in court. Def.'s Mem. in Opp.'n to Mot. for Prelim. Inj. 10. Another follow-up request for clarification went ignored. *Id.* At the preliminary injunction hearing, however, Martin Field (formerly the principal at Field Packaging and who became Croner's Sales Manager after PCA acquired Field) testified that he told Croner many times that PCA believed that the non-solicitation agreement was enforceable.

---

presented at the hearing or in the preliminary injunction briefing. For the most part, the evidence at the hearing was consistent with the facts alleged in the complaint; where material, conflicts are identified and resolved according to the relevant standard.

In 2016, Welch began recruiting Croner to return to its employ. The recruitment continued into the fall of 2018, at which point Croner told Welch executives that he was "gathering data" for everyone to review. Mot. for Prelim. Inj. 9. The following spring, the courtship continued, with Croner telling PCA that he had "opened up to you on my accounts, a strategy to move forward and a game plan with PCA." *Id.* at 10. Eventually, Croner resigned from PCA on May 6, 2019 and accepted an offer to return to Welch as an Executive Vice President of Business Development ▮

▮. That offer included a third restrictive covenant that Croner signed. Shortly after leaving PCA, Croner, by his own admission, began soliciting some of his former clients from PCA. Mot. for Prelim. Inj., Pl.'s Ex. 38.

The key portion of the 2007 non-solicitation agreement between Croner and Field[2] reads as follows:

> [I]f [the employee] voluntarily terminates his employment with Company or is terminated by the Company for any reason other than fraud, theft, embezzlement, commission of a felony, engaging in unlawful sexual harassment, or violation of paragraph 2, Non-Disclosure/Confidentiality, Employee will not for the twelve (12) month period following his termination directly or indirectly solicit, service, have contact with, or divert any entity which is, as of the time of the termination of Employee's employment or the immediate twenty-four (24) month period prior to such termination, a customer of the Company or prospective customer with whom Employee had prior dealings or who were customers of the Company about whom Employee learned as a result of his employment or through confidential, proprietary or trade secret information of the Company. The only exception is that this paragraph shall not apply to those customers of Employee with whom he had an on-going relationship as of the date he became employed by Company and who were not already customers of Company.

---

[2] PCA refers to this agreement as the "PCA Restrictive Covenant," but that moniker puts the cart before the horse in assuming that PCA succeeded to Field's rights in the agreement upon its acquisition of Field in 2011. As discussed *infra*, the contract does not contain an assignment clause, but for purposes of adjudicating PCA's preliminary injunction motion, the Court concludes that Croner's employment contract was assigned to PCA and remains binding on Croner.

Compl. Ex. 1 at 2-3, ECF No. 1. Croner and a representative for Field signed the agreement on

July 31, 2007. PCA did not require, or ask, Croner to sign a new non-solicitation agreement with

PCA after it acquired Field, and the 2007 employment contract between Croner and Field does not

contain an assignment clause. The purchase agreement between PCA and Field, however,

expressly lists Croner's contract with Field as a material contract acquired in the deal:

> 12. Agreement between Company and Patrick Croner dated 7/31/07, Summary of Offer dated 6/19/07 regarding confidentiality, non-competition and non-solicitation, Limited Release from Non-Competition and Confidentiality Agreement dated 7/19/07.

Pl.'s Mem. of Law in Support of its Mot. for a TRO Ex. 2, ECF No. 9.

On May 15, 2019, nine days after Croner's resignation, PCA filed a three-count complaint

alleging Croner: (1) violated the DTSA; (2) breached the restrictive covenant in his employment

contract with PCA; and (3) violated the ITSA. On May 23, 2019, the Court granted in part the

plaintiff's motion for a temporary restraining order seeking to restrain Croner from contacting a

restricted list of PCA customers with whom he had dealt during the 24-month period before his

resignation. The Court carved out two exceptions to the restrictive list: (1) any customers with

whom Croner had an ongoing relationship prior to the 24 months preceding his resignation from

PCA; and (2) any customers who were clients of both PCA and Welch during the 24-month period

preceding Croner's resignation.

Following entry of the temporary restraining order, Croner filed a partial motion to dismiss

for failure to state a claim with respect to Counts I and III (the federal and state trade secrets

counts), and PCA filed a motion for a preliminary injunction. The parties conducted limited,

expedited, discovery and briefed both Croner's motion to dismiss and PCA's motion for

preliminary injunction in advance of a preliminary injunction hearing conducted on October 30,

2019.

At the preliminary injunction hearing, the Court heard from two witnesses: Croner and Martin Field, an executive at PCA who had previously been deposed as PCA's corporate representative. As a general point, the Court notes that Mr. Field's testimony at the injunction hearing differed significantly and frequently from his deposition testimony, as he repeatedly gave answers inconsistent with his prior responses at the deposition. For example, while he had previously admitted that PCA had no proof that Croner had taken confidential information with him upon his resignation, he stated at the hearing that he had changed his mind after further investigation. He also initially had declared under oath: that the proper procedure at PCA to remove data from a piece of hardware is to delete the data; that Croner had not returned a single document or electronic file to PCA; that only he and an information technology employee had access to PCA's internal pricing system; that it is not possible to reverse engineer those pricing procedures using the final price; that PCA sales representatives do not have access to this internal pricing data; that it would be impossible to memorize the costs for all of PCA's millions of products; that it would also be impossible to memorize all of the details relating to customer preferences; and that other companies also working with PCA clients likely learned the same customer preferences as PCA. When asked about these responses at the injunction hearing, Field recanted on each of these subjects, once again citing new information learned or alternative lines of thought. His responses included admissions that he personally inspected Croner's office after his departure (despite having signed a declaration stating that he had not done so) and that Croner had actually left documents in folders on his desk despite having signed a declaration stating that Croner had returned no documents to PCA. Field's responses regularly included statements to the effect of "I thought the answer was correct when I gave it but on further review, I decided that it wasn't." He nonetheless also acknowledged that, as PCA's corporate representative, it had been his duty to be

prepared to set forth PCA's position as to relevant facts at the deposition. While an occasional need to modify a prior response is to be expected, particularly in the context of the expedited process of preparing for a preliminary injunction hearing, the level of backtracking engaged in by Mr. Field significantly diminished his credibility as a witness.

## DISCUSSION

### A. Motion to Dismiss

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The defendant's partial motion to dismiss only addresses the DTSA and ITSA allegations in Counts I and III, respectively. Thus, the Court need not address the breach of contract claim in Count II in the context of the motion to dismiss.

### 1.     Count I: DTSA

The complaint alleges that Croner violated the DTSA by misappropriating PCA's trade secrets. To state a claim for violation of the DTSA, the plaintiff must first allege facts sufficient to provide notice that the relevant information constitutes a trade secret. 18 U.S.C. § 1836(b)(1). Here, PCA alleges that the trade secrets in question include information about its customers, such as their purchase histories and preferences, as well as PCA's internal pricing and costing processes. At this stage in the proceedings, this level of specificity is sufficient and Croner does not contest the adequacy of this aspect of the complaint.[3]. In order to survive a motion to dismiss, plaintiffs

---

[3] In briefing on the preliminary injunction motion, by contrast, the parties devote extensive attention to the issue of whether the information Croner could access during his time at PCA constitutes a trade secret. In the context of a motion to dismiss, the plaintiff must only plead facts sufficient to provide notice of the factual basis for its trade secret claims. While the complaint has done so, it still fails to state a claim because it does not adequately allege misappropriation of the

must only plead the existence of trade secrets in broad strokes, as opposed to the more targeted showing required for injunctive relief. *See Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp.3d 813, 818 (N.D. Ill. 2014)) ("[C]ourts have found allegations to be adequate in instances where the information and the efforts to maintain its confidentiality are described in general terms.") (collecting cases). While additional discovery might reveal that PCA's customer purchase histories and preferences do not actually constitute trade secrets, the allegations here adequately provide notice as to the basis of the trade secret claims.

Once a plaintiff adequately pleads the existence of a trade secret, it then must sufficiently allege that the defendant has misappropriated the trade secret within the meaning of § 1836(b)(1). The DTSA defines "misappropriation" as either the "acquisition of a trade secret of another . . . by improper means" or the "disclosure or use of a trade secret of another without express or implied consent. . ." 18 U.S.C. § 1839(5)(A)-(B). The parties agree that with respect to the motion to dismiss, "we are looking at whether a trade secret was (a) acquired by or for improper means, (b) disclosed without consent, or (3) used without consent." Resp. to Motion to Dismiss, ECF No. 48, at 3.

Here, PCA does not plausibly allege misappropriation by Croner. The complaint itself makes plain that rather than acquiring the alleged trade secrets by improper means, Croner acquired them through the normal course of his employment: "In order to perform his job responsibilities, Croner was given access to confidential information and trade secrets" that "PCA paid Croner to acquire, accumulate, and assemble over years." Compl. ¶ 29, 33. Even if Croner did not return the information, as Plaintiff alleges, the failure to return lawfully acquired

---

alleged trade secrets. *See infra*. The Court need not, therefore, further address the issue of whether the information does, in fact, constitute a trade secret.

information does not constitute "misappropriation" of that information under the DTSA. *See, e.g., Prominence Advisors, Inc. v. Dalton*, No. 17-CV-04369, 2017 WL 6988661 at *4 (N.D. Ill. Dec. 18, 2017) (rejecting argument that the defendant obtained information by improper means where he retained access, initially acquired during the normal course of his employment, to a DropBox folder and external hard drive that contained confidential information).[4]

Given that Croner did not acquire the allegedly secret information by improper means, the misappropriation analysis hinges on whether PCA adequately alleges that Croner has disclosed or used the trade secrets without express or implied consent. PCA primarily bases the allegations in its complaint of unauthorized disclosure on the fact that Croner admits to having solicited some of his former clients from PCA and on the inference that "because Croner has not returned any information to PCA, Croner is using PCA's Confidential Information and Trade Secrets in connection with these solicitations." Compl ¶ 37. The complaint provides no additional factual support for this assertion, however. But even if the Court infers Croner's possession of the information in question, mere possession of trade secrets does not suffice to plausibly allege disclosure or use of those trade secrets, even when considered in conjunction with solicitations of former clients. *See, e.g., Indus. Packaging Supplies, Inc. v. Channell*, No. 18-CV-00165 2018 WL 2560993 at *2 (N.D. Ill. 2018) (holding that allegations that the defendants, former employees with access to trade secrets, left for a competitor offering the same services to the same clientele

---

[4] The *Dalton* court also explains that the plaintiff "concedes in the Complaint that [the defendant] originally came into possession of the Confidential Information legitimately; the ITSA's improper acquisition prong only relates to how an individual came to possess the trade secret, not the circumstances of his continued possession." 2017 WL 6988661 at *5. Although this analysis is framed in the context of the ITSA, it remains relevant here because the DTSA's and ITSA's improper acquisition prongs are almost verbatim.

are "not enough to justify [the plaintiff's] otherwise unsupported suspicions that the defendants used or disclosed" trade secrets).

To supplement its complaint, PCA also argues in its response to the motion to dismiss that its allegations state a plausible misappropriation claim because additional evidence has been adduced that Croner has deleted some PCA files from his computer and has solicited some customers he serviced at PCA, which in turn has lost several significant customers to Welch in the wake of Croner's departure. Croner contends that the Court cannot consider such evidence, however, because it is "restricted to an analysis of the complaint when evaluating a motion to dismiss," citing *Hill v. Trustees of Ind. Univ.*, 537 F.2d 248, 251 (7th Cir. 1976) and other similar cases which sing this common refrain. The argument is more complicated, however, because none of the cases Croner cites address the equally well-established rule that "a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove" so long as they are consistent with the allegations of the complaint. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). *See also, e.g.*, *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 79 (7th Cir. 1992) ("a plaintiff is free ... to allege without evidentiary support any facts he pleases that are consistent with the complaint"). None, moreover, discuss the interplay between the evaluation of a motion to dismiss that is under consideration contemporaneously with a motion for preliminary injunctive relief that includes additional evidentiary submissions. The natural corollary to the rule that a plaintiff may supplement its argument in opposition to a motion to dismiss with unpleaded facts that are consistent with the allegations of the complaint is that, to the extent that they are consistent with the allegations of the complaint, a plaintiff may rely on facts adduced at a preliminary injunction hearing when

responding to a contemporaneous motion to dismiss. *In re Dealer Management Systems Antitrust Litig.*, 313 F. Supp. 3d 931, 938-39 & n.1 (N.D. Ill. 2018) (St. Eve, J.).

As a result, the Court also considers the evidence submitted by PCA in support of a preliminary injunction. PCA first argues that Croner has admitted to the spoliation of evidence and that, accordingly, the Court should infer that he is being deceptive and that he has misappropriated PCA's trade secrets. PCA claims that Croner, who was allowed to use his personal computer during the course of his PCA employment, wrongfully deleted material off that laptop after his resignation. But the fact that Croner deleted information from his computer does not suffice to plausibly suggest that he intended to deny PCA access to material evidence of misappropriation. Mr. Field, PCA's corporate representative, admitted during the preliminary injunction hearing that the company would not want departing employees to keep confidential information on their personal computers. If anything, Croner's deletions support his claim that he did not use or disclose any trade secrets—he took active steps to ensure that he was no longer in possession of confidential materials from his previous job. PCA also asserts that the Court can infer Croner has acted in bad faith because he initially failed to disclose the deletions in his declaration filed in opposition to PCA's motion for a temporary restraining order. Croner, however, filed additional declarations on his own accord when he realized his omission and agreed to a forensic examination of his laptop (the results of which PCA has not cited in support of its arguments). These undisputed actions simply do not support an inference that Croner was acting in bad faith when he deleted PCA information from his computer.

PCA's argument with respect to the deletions goes hand-in-hand with its claims that the Court may infer that Croner is still in possession of confidential material because he did not return any documents to the company upon his departure. Croner counters that he left several files and

his work computer on his desk and deleted the files on his personal laptop to ensure that he did not retain possession of them. Mr. Field himself also acknowledged at his deposition that PCA has "zero proof" that Croner actually took any confidential information with him.[5] Prelim. Inj. Def. Ex. A 76. Croner's actions were a reasonable method for complying with PCA's demand to return materials to the company. It is unclear what further steps Croner could have taken. Mr. Field suggested that Croner could have printed out the files on his laptop and returned the hard copy versions to the company, but such a procedure would have been pointless, as it would not have remedied Croner's ongoing possession of the underlying electronic files. The only action Croner could have taken in that regard is to delete the files—which all acknowledge that he did. By positing that Croner did both too much and too little in trying to divest himself of its secrets, PCA is trying to have its cake and eat it too.

Even if the Court were to accept PCA's contentions that the lack of return and the deletions are proof of Croner's deception, it still would only be able to find that Croner was in possession of the secrets. PCA's new evidence here does nothing to remedy its failure to state a claim that Croner has used or disclosed trade secrets.

PCA attempts to address the disclosure issue more directly by referencing the communications exchanged during Welch's courtship of Croner. Croner admits that as part of the negotiations with Welch, he shared his total sales figures broken down by general category. PCA claims, without any supporting evidence or authority, that such information is confidential. Croner

---

[5] As described *supra*, Mr. Field later recanted this statement, along with many others, at the preliminary injunction hearing, explaining that he changed his mind after further investigation. Mr. Field acknowledged that he was PCA's corporate witness at his deposition and that it was his responsibility to learn any information related to his facility's trade secrets in preparation for that hearing. In the Court's view, Mr. Field's testimony at the hearing was less than fully reliable and credible.

disagrees, stating that it is the norm in the sales industry to cite total sales as a benchmark of performance, and that he even divulged the same type of information when recruited by Field to leave his first job at Welch. Mr. Field himself indicated at the injunction hearing that he believed Field was entitled to know certain information about Croner's accounts at Welch, such as the identities of his customers, when recruiting him to Field in 2007.

Croner further asserts that during these negotiations, he did not share any other sales- or customer-related information with Welch, nor give it any documents, because unlike his personal sales figures, revealing that information provided no benefit to him.[6] PCA disagrees, and "respectfully" accuses Croner of lying based on an email he sent to Welch representatives stating that he was "gathering data" for an upcoming meeting that lasted for a couple of hours. Pl.'s Mem. of Law in Supp. of its Mot. for a Prelim. Inj. 9, ECF No. 53. Respectfully, however, PCA has presented no evidence to support that allegation or to rebut Croner's explanation that his total sales and sales mix constituted the data referred to in the email. Additionally, the length of the meeting simply has no bearing on the issue, as Croner and the Welch representatives could have discussed any number of topics in those two hours. PCA's contention that Croner supplied confidential data to Welch during this meeting is entirely speculative.

PCA also cites other emails, in which Croner strategizes about new client lists and how best to reach his new sales targets at Welch, as evidence of trade secret disclosure. Again, PCA can point to no factual evidence to support its theory that these emails illustrate confidential information disclosure. Croner explained that he generated prospective client lists before and after

---

[6] PCA also avers that because Croner did not believe that any of the information was confidential that he came across during his employment at PCA, the Court can infer that he has disclosed everything to Welch. Putting aside the parties' disagreement about whether Croner had access to trade secrets at PCA, the plaintiff still must provide a factual basis for its allegations. Otherwise, its argument amounts to no more than unsupported speculation.

his resignation using SalesGenie, a publicly available third-party vendor. PCA has no evidence to the contrary. The lucrative compensation promised to Croner, as well as the ambitious sales targets, also are not evidence of wrongdoing, despite PCA's allegations to the contrary. Neither the Court nor PCA have any factual basis for believing that the compensation and sales targets have any relationship to PCA's trade secrets. Indeed, Croner's efforts to develop "new" client lists undermine PCA's claims that Croner's plan depended upon his ability to poach the clients he serviced at PCA.

Similarly, the fact that PCA has lost business to Welch since Croner's resignation fails to support a plausible inference that Croner has misappropriated trade secrets. By all accounts, Croner is an effective salesman; he doubtless had strong relationships with many of his clients. In that light, it is hardly surprising, or probative of misappropriation, to learn that some of the companies with which he had worked while at Field and PCA had followed him to Welch. PCA, just like the plaintiff in *Channell*, fails to provide any factual support for its suspicions that Croner disclosed trade secrets while competing with PCA at Welch. 2018 WL 2560993. Particularly in a highly competitive business (which all concede accurately describes the corrugated packaging industry), lost business alone is not enough to support a claim of trade secret misappropriation, and PCA must adequately allege that Croner has done more than legally compete in the normal course of business. It has not done so.

In addition to its allegations that Croner misappropriated its trade secrets, the complaint also briefly gestures to the doctrine of inevitable disclosure of trade secrets. The DTSA allows courts to grant injunctions in certain circumstances for "threatened" misappropriation. 18 U.S.C. § 1836(b)(3). Illinois courts have found that plaintiffs can state a claim for threatened

misappropriation by demonstrating the inevitability of trade secret disclosure.[7] *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) ("Illinois law . . . allow[s] a court to enjoin the "inevitable" disclosure of trade secrets.).

Courts examine three factors in an inevitable disclosure analysis: (1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions the new employer has taken to prevent the use or disclosure of the former employer's trade secrets. *PepsiCo v. Redmond*, No. 94-CV-06838, 1996 WL 3965 at *20 (N.D.Ill.1996) (internal citations omitted). In addition, plaintiffs must allege more than "the mere fact that a person assumed a similar position at a competitor" to state a claim for inevitable disclosure, *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995), which requires "a showing of intent or a high probability" that the employee will use trade secrets. *Saban v. Caremark Rx, L.L.C.,* 780 F. Supp. 2d 700, 734 (N.D. Ill.2011) (internal citations omitted). Courts are "cautious" in their application of the doctrine due to its significant potential to curb employee movement among competitors. *Triumph Packaging Group v. Ward*, 834 F. Supp. 2d 796, 809 (N.D. Ill. 2011).

PCA's complaint alleges facts to substantiate the first two factors of the test: PCA and Welch are direct competitors, and Croner's new and former positions, while not identical, both involve sales of the same type of product. Beyond that, though, the only other fact that PCA puts forth is that Croner began to solicit PCA customers after switching jobs: "it also is inevitable that

---

[7] Although the Seventh Circuit has permitted inevitable disclosure claims under the ITSA, it has not explicitly allowed them under the DTSA. Other courts in this district, however, have analyzed inevitable disclosure under both laws, which suggests that the doctrine is available in either context. *See, e.g., Indus. Packaging Supplies, Inc. v. Channell*, No. 18-CV-00165 2018 WL 2560993 (N.D. Ill. 2018); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 1:16-CV-03545, 2017 WL 1954531 (N.D. Ill. May 11, 2017).

[Croner] will misappropriate PCA's Trade Secrets . . . given his prior position with PCA, the identity and similarity of his new position with Welch, and the fact that he is soliciting the Restricted Customers he served for PCA." Compl. ¶ 38. These facts are insufficient to state a claim for inevitable disclosure. PCA has alleged nothing with respect to the actions Welch has or has not taken to prevent trade secret disclosure. It also provides no foundation upon which the Court might find a showing of intent or high probability that Croner will use its trade secrets, especially in light of the skepticism other courts in this district have shown toward the inevitability doctrine.

Previous plaintiffs that have succeeded in stating claims for inevitable disclosure in this district have alleged that the defendant "could not operate or function" in the new position without relying on the trade secrets. *Strata Marketing, Inc. v. Murphy*, 740 N.E.2d 1166, 1179 (Ill. App. 2000); *See also Allied Waste Servs. of N. Amer., LLC v. Tibble*, 177 F.Supp.3d 1103, 1112 (N.D. Ill. 2016); *Complete Bus. Sols., Inc. v. Mauro*, No. 01-CV-00363, 2001 WL 290196 (N.D. Ill. Mar. 16, 2001). But the facts of the complaint make clear that disclosure is not inevitable here.

The relevant facts in this case closely resemble those at issue in *Mauro*, where the court dismissed an inevitable disclosure claim. 2001 WL 290196. The defendant in *Mauro* had signed a contract with the plaintiff containing a non-solicitation clause prohibiting him from soliciting any former clients that he had contacted during the 12-month period leading up to his resignation. *Id.* at *5. The court held both that the complaint insufficiently pleaded that the defendant could not operate without the secrets and that the doctrine did not apply to the facts of the case. *Id.* The *Mauro* court explained the case could not proceed on an inevitability theory because the defendant's contract "affirmatively allows [the defendant] to immediately compete with [the plaintiff] and solicit its clients, as long as [the defendant] had no contact with the clients for a one-year period prior to his resignation." *Id.* n. 8. Because the non-compete clause was not a complete

15

bar on solicitations, the contract itself thus indicated that the defendant could compete without disclosing trade secrets.

The same holds true in the present case. Croner's non-solicitation agreement contains carve-outs based on the timing of the most recent contact and the timing of the creation of the business relationship, as PCA acknowledges in the complaint:

> "Notably, the PCA Customer Restrictive Covenant does not preclude Croner from working for a competitor such as Welch, nor does it even preclude him from calling upon those customers which he brought to the employment relationship when he moved from Welch to Field Packaging (who were not already PCA customers). Rather, the applicable customer restriction only prevents him for 12 months from soliciting or servicing the PCA customers he otherwise began servicing while at PCA.

Compl. ¶ 3. And to be clear, the carve out is broader than PCA describes, as it also allows Croner to solicit any company that had been a PCA customer at any time prior to the 24 months prior to Croner's resignation but was not a customer during that 24-month period.

Furthermore, the complaint also specifies that Croner previously switched jobs in the reverse direction, transitioning from Welch to Field. And by PCA's own admission, Croner's original contract with Welch "actually contained more restrictive customer restrictions than the ones at issue in this matter." *Id.* ¶ 17. If it was not inevitable that Croner would reveal trade secrets when he moved from Welch to Field in 2007 under a more restrictive contract (and PCA takes the position that it was not), why would it be inevitable when he subsequently moved from PCA to Welch? In any event, the fact that Croner has admitted to soliciting some of his former clients (at least some of whom he was permitted to solicit by the agreement) does not overcome these shortcomings because they do not plausibly establish that Croner did, in fact, use trade secrets in doing so. While it is ***possible*** that he did so, the complaint alleges no facts that make it ***plausible*** to infer that he did so. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 557 (2007) (dismissing

complaint where allegations fell "short of the line between possibility and plausibility of entitlement to relief"). PCA's inevitable disclosure theory therefore falls short.

### 2. Count III: ITSA

Plaintiffs alleging ITSA violations must show: (1) the presence of a trade secret; (2) that was misappropriated; and (3) that the defendant actually used the trade secret in its business. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). This analysis, therefore, contains the same first two prongs of the DTSA analysis and adds the third. PCA effectively concedes that as goes its DTSA theory, so goes its ITSA theory. Resp. Br., ECF No. 48, at 3. Because PCA insufficiently pleads that Croner misappropriated the trade secrets, *see supra*, the complaint also fails to state a claim under the ITSA.[8] The inevitability doctrine analysis remains the same under the ITSA. As a result, for the reasons described above, the complaint fails to state a claim under the ITSA.

### 3. Leave to Amend

PCA argues that in the event of a dismissal, the Court should permit amendment of the complaint based on the new information learned during initial discovery. Per Rule 15(a), leave to amend a complaint should "be freely given when justice so requires." The Seventh Circuit has noted that a liberal standard for granting leave to amend is "especially advisable" after dismissal of the original complaint. *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission*, 377 F.3d 682, 687 (7th Cir. 2004). Still, "[a] district court does not abuse its discretion in denying leave to amend if the proposed repleading would be futile." *Garcia v. City of Chicago, Ill.*, 24 F.3d 966, 970 (7th Cir. 1994).

---

[8] Because the complaint contains no facts alleging that Croner or Welch have actually used the information in their business, the complaint would also fail the third prong of the ITSA analysis.

Here, the Court has the benefit of the additional information revealed during initial discovery for the preliminary injunction. By considering this new information, the Court can determine whether it would be futile to grant PCA leave to amend its complaint with respect to its trade secrets claims. As discussed above, the information that came to light during the preliminary injunction hearing does not remedy the shortcomings of PCA's complaint. PCA argues that the Court should grant leave to amend its complaint to include Croner's deletion of electronic materials off his personal laptop, failure to return confidential information to PCA, and solicitation of PCA clients, as well as PCA's lost business since Croner's departure. For the reasons already discussed, none of these supplemental allegations suffice to plausibly suggest that Croner violated the DTSA or ITSA by disclosing trade secret information of PCA to Welch. As a result, granting PCA leave to amend its complaint would be futile and the Court dismisses Counts I and III with prejudice.

**B. Motion for Preliminary Injunction with Respect to Count II: Breach of Contract**

Because Croner's motion to dismiss did not seek to dismiss Count II of the complaint, the Court now turns to the plaintiff's motion for a preliminary injunction with respect to the lone remaining count.[9] The Seventh Circuit has issued a clear standard for evaluations of preliminary injunctions:

> An equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly

---

[9] The parties argue the preliminary injunction almost exclusively in the context of the non-solicitation agreement and the alleged trade secret violations. They largely ignore the viability of the breach of contract claim in terms of the confidentiality agreement, except to the extent that it overlaps with the DTSA and ITSA analysis. As described above, there is not an adequate factual basis in the record to plausibly state a claim that Croner misappropriated any confidential information or trade secret. Accordingly, to the extent that PCA is pressing a breach of contract theory based on violations of contractual confidentiality obligations, PCA has failed to establish a likelihood of succeeding on the merits with respect to such a claim and, in turn, has also failed to establish a showing of irreparable harm.

demanding it. It is never awarded as a matter of right. To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase.

To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements. It must show that: (1) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) its claim has some likelihood of succeeding on the merits.

If the moving party satisfies each of these requirements, the court proceeds to the balancing phase of the analysis. In the balancing phase, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. In so doing, the court employs a sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the public interest).

*Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 965–66 (7th Cir. 2018) (internal quotations, citations, and punctuation omitted). Although PCA's breach of contract claim is likely to succeed on the merits, it has not shown that traditional legal remedies would be inadequate or that it would suffer irreparable harm if the Court denies its motion for a preliminary injunction.

### 1. Likelihood of Success on the Merits

A party moving for a preliminary injunction "must only show that [its] chances to succeed on [its] claims are better than negligible." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (internal quotations and citations omitted). The plaintiff here has met this low bar with respect to the non-solicitation agreement.

Croner disputes the merit of the breach claim primarily by attacking the validity of the restrictive covenant. He first posits that the restrictive covenant had expired by the time of his resignation from PCA because PCA's purchase of Field terminated his employment with Field and triggered the 12-month non-solicitation period. In other words, because the contract did not contain

an express assignment clause, Croner argues that the restrictive covenant was not automatically assigned to PCA after the purchase. Croner cites no Illinois law to support his argument, however, and this Court has found none either.[10] While there does not appear to be Illinois authority directly on point, Illinois "does not have a *per se* rule prohibiting assignment of a contract" and courts assessing whether a restrictive covenant is assignable in the absence of an assignability provision "have generally predicted that Illinois would permit assignment of a non-compete without consent." *Cronimet Holdings, Inc. v. Keywell Metals, LLC*, 73 F. Supp. 3d 907, 915 (N.D. Ill. 2014). *See also AutoMed Techs., Inc. v. Eller*, 160 F.Supp.2d 915, 924 (N.D. Ill. 2001) ("Without any Illinois precedent holding that restrictive covenants may never be assigned without consent, we are unwilling to anticipate new public policy restrictions on contract rights.").[11] Based on what has been presented, the Court is inclined to agree that the assignment occurred despite the lack of an assignment clause and remained valid at the time of Croner's resignation.[12]

Croner next contends that even if assignment occurred, the clause is overbroad and unenforceable. He points first to the language in the clause referring to both past and prospective customers. PCA, though, has made it clear that it only seeks a preliminary injunction with respect

---

[10] Croner relies instead on *OfficeMax, Inc. v. Levesque*, 658 F.3d 94 (1st Cir. 2011), but in that case the agreement at issue included an express provision authorizing the acquiring company to solicit noncompetition agreements of "substantially the same form" as the existing agreement; the court held that the contract therefore plainly anticipated that the existing non-compete agreement would not survive merger indefinitely but would be enforceable only for its term. There is no similar provision in the Field-PCA agreement.

[11] There is no dispute that the assignment, if permissible, actually occurred. In the TRO hearing, PCA pointed out that the PCA-Field purchase agreement expressly identifies the restrictive covenant as a contract to be included in the sale. Pl.'s Mem. of Law in Supp. of Mot. for a TRO Ex. 2, ECF No. 9.

[12] As a result, it has no bearing on the contract whether the assignment occurred in 2011 when PCA purchased membership interests in Field or in 2014 when PCA and Field legally merged.

to the specific set of customers identified as the restricted customers in the Court's temporary restraining order ruling. The defendant's concern with respect to past and prospective customers is consequently rendered moot. Croner then discourages the Court from applying the clause only to the restricted list of customers because it would amount to a drastic modification requiring extensive "blue penciling." *Id.* at 7-8; *see, e.g., Carlson Group v. Davenport,* No. 16-CV-10520, 2016 WL 7212522 (N.D. Ill. Dec. 13, 2016). But the modifications required in this case would be relatively minimal, and the Court has already made the necessary modifications required in granting the temporary restraining order.[13] There also is no evidence that the plaintiffs here have attempted to use an extraordinarily broad non-solicitation clause with hopes that the Court would redraft the contractual language if it deemed it overbroad. *Compare with AssuredPartners, Inc. v. Schmitt,* 44 N.E.3d 463, 475 (Ill. App. 2015) ("Plaintiffs outright acknowledge that the nonsolicitation provision was drafted "broadly" in an attempt to extend the scope of protection under the provision.").

Lastly, relying largely on *Curtis 1000, Inc. v. Suess,* Croner argues that even if the clause had been originally drafted to only apply to the restricted list of customers, it still would be unenforceable because the plaintiff, a seller of ordinary goods, lacks a protectable interest in its customers. 24 F.3d 941 (7th Cir. 1994). The defendant relies too strongly on *Suess,* however, especially in light of the subsequent Illinois Supreme Court decision in *Reliable Fire Equipment Co. v. Arredondo*:

> [W]hether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the

---

[13] The Court's only modifications to the PCA's proposed restricted list were to exclude any customers with whom Croner had an ongoing relationship prior to the 24 months preceding his resignation from PCA, as well as any customers who were clients of both PCA and Welch during the 24-month period.

employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case.

965 N.E.2d 393, 403 (Ill. 2011). In this case, PCA has maintained throughout the case that its customer relationships are near-permanent, and Croner has provided no evidence to contradict that claim. For what it is worth, the non-solicitation clause itself also explicitly refers to the "near permanent nature" of the customer relationships.[14] Compl. Ex. 1 at 2, ECF No. 1. With respect to Croner's acquisition of confidential information through his employment, although the parties disagree as to whether the information learned by Croner constitutes a trade secret, Croner himself acknowledged in his testimony that he learned information that, at the very least, he would not disclose to a competitor. The parties also agree that Croner signed contracts both before and after the 2007 contract that also contained restrictive covenants, which further suggests that such clauses are not inherently unreasonable in this field. Finally, although the clause does not contain a geographic boundary, it limits the restriction's duration to 12 months. Taking all of these factors

---

[14] It is worth noting that the non-solicitation agreement contains various clauses with conclusory language, such as: "Employee acknowledges that a breach of any of the covenants herein contained would cause irreparable harm to the Company's business and that monetary damages would be difficult or impossible to ascertain and will not afford an adequate remedy." Compl. Ex. 1 at 4. While the parties do not focus on this issue, courts across the country have minimized the importance of such clauses. *See, e.g., Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (finding that "the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate"); *Dragon Jade Intl., Ltd. v. Ultroid, LLC,* No. 8:17-CV-2422-T-27TBM, 2018 WL 1833160, at *4 (M.D. Fla. Jan. 30, 2018) ("[T]he consensus among the reported decisions appears [to be] that contractual provisions regarding entitlement to injunctive relief are accorded little to no weight."); *Super Chefs, Inc. v. Second Bite Foods, Inc.*, No. CV-15-00525 SJO (FFMx), 2015 WL 12914441, at *4 (C.D. Cal. June 11, 2015) ("[D]istrict courts in this circuit give little weight to [irreparable harm] clause[s] ... that pre-declare[ ] that any breach of the Agreement will result in irreparable harm.") (internal citations and quotations omitted); *Firemen's Ins. Co. of Newark, New Jersey v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990) ("[I]t is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate.").

into account, the Court rejects Croner's argument that the restrictive covenant is unenforceable due to a lack of a protectable interest.

Croner also argues against enforcement of the contract even if the Court finds it valid because PCA is equitably estopped from asserting its claim, due to the fact that Croner, during the course of his employment, spoke on multiple occasions with PCA executives about the status of his contract. Def.'s Mem. in Opp.'n to Mot. for Prelim. Inj. 9-12. According to the defendant, because PCA never informed him during these interactions of its belief that the contract remained valid and enforceable, the plaintiff is equitably estopped from asserting a breach of contract claim.

To substantiate a claim of equitable estoppel, a party must show that:

(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof.

*Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2001) (citing *Vaughn v. Speaker*, 533 N.E.2d 885 (Ill. 1988). Equitable estoppel analyses are fact dependent, and "[t]he party claiming estoppel has the burden of proving it by clear and unequivocal evidence." *Id.* Croner plainly has not alleged facts to prove these elements by clear and unequivocal evidence. He has merely alleged that PCA did not respond to his liking to his series of requests for clarification. PCA management explicitly told him of its view that the contract had been inherited as part of its acquisition of Field, as well the fact that the company would not be inclined to enter into a new agreement.

Croner suggests that because PCA merely informed him that the contract had been inherited, and not that it believed the contract to be valid and enforceable, that he rightfully relied on that silence to infer that the contract was no longer valid. While silence can lead to a claim for equitable estoppel, Croner has cited no legal authority for the claim that an employer-employee relationship is the type of special relationship that gives rise to a duty to speak. *Bondy v. Samuels*, 165 N.E. 181, 186 (Ill. 1929) (holding that silence can give rise to an estoppel claim when "there is a duty to speak and the party on whom the duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent"). Even if PCA had a duty to speak, moreover, Croner does not convincingly explain why he should not have concluded that PCA believed the contract to be enforceable based upon its declaration that the contract had been inherited and that the company was not interested in revising it. After all, inheriting an unenforceable contract would have been useless, from PCA's perspective. In addition, Croner was also free to retain an attorney to investigate the validity of the clause, regardless of PCA's views on the matter. In short, PCA has not committed the type of deceptive or nefarious conduct that equitable estoppel is intended to remedy.[15]

---

[15] Croner also briefly contends that the contract is not enforceable because substitution of PCA for Field materially altered Croner's contractual burden without his consent. *See People ex rel. Sterba v. Blaser*, 337 N.E.2d 410, 416 (Ill. Ct. App. 1975) ("[I]t is elementary that no contract can be modified or amended in an Ex parte fashion by one of the contracting parties without the knowledge and consent of the remaining party to the agreement."). Croner claims that because PCA is so much larger than Field, the scope of a restrictive covenant enforced as to PCA's customers would be so much broader in scope that it would result in a material alteration of the contract. As described above, PCA is only endeavoring to enforce the non-solicitation clause against the restricted list of customers, rendering Croner's concerns moot. Nevertheless, the material alteration claim would also fail even if applied to the entire contract. The *Blaser* court found that the employer defendant had unilaterally altered the plaintiff employee's personnel record without his knowledge to an extent sufficient to constitute a material alteration of the employment contract. *Id.* at 414. PCA here has done nothing of the like; the only change in the contract that occurred was its assignment to PCA, which was valid with or without Croner's consent.

In short, the restrictive covenant was valid and enforceable after its assignment to PCA and PCA is not equitably estopped from filing its breach claim. Croner does not argue that there is insufficient evidence that he has solicited customers within the scope of the non-solicitation agreement, and his acknowledgement at the injunction hearing that he had solicited at least 34 clients with whom he had dealt during the 24-month period before he resigned from PCA suffices to establish some likelihood of success on the merits on the breach claim.[16] Mot. for Prelim. Inj., Pl.'s Ex. 38. Consequently, PCA has satisfied its burden with respect to its likelihood of succeeding on the merits.

### 2. Irreparable Harm and Adequacy of Legal Remedy

Even with a showing of a strong likelihood of success on the merits of its case, a plaintiff must also demonstrate that irreparable harm is "likely" if the court denies a motion for preliminary injunction. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). PCA largely grounds its argument in support of irreparable harm in claims of lost customers, sales, and profits. PCA contends that it has lost more than $6 million in sales to Welch and that it "is confident" it has lost business from at least four customers. Mot. for Prelim. Inj. 2. The plaintiff also alleges that its lost profits make damages difficult to calculate.

PCA, largely relying on cases pertaining to the misappropriation of trade secrets, then suggests that the Court should find a presumption in favor of irreparable harm because Croner has breached his restrictive covenant. *See, e.g., Jano Justice Sys., Inc. v. Burton*, 636 F. Supp. 2d 763,

---

[16] At a status hearing on June 14, 2019, Croner's counsel expressly disavowed the need to conduct discovery as to actual breach, contending that such information was only needed to assess damages in the event that the non-solicitation agreement is held to be enforceable. See 6/14/19 Tr., ECF No. 30, at 7:24 – 8:4 ("We're requesting that their discovery be limited solely to the issues that would be relevant to the preliminary injunction, so specifically to exclude any discovery on whether or not my client has breached the restrictive covenant as breach would only go to ultimate liability or damages").

767 (C.D. Ill. 2009) (explaining that "in cases of **trade secret misappropriation and copyright infringement**, there is a presumption of irreparable harm") (citations omitted) (emphasis added); *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (finding that "the threat is significant that the harm experienced by the **misappropriation or misuse of trade secrets** will be irreparable") (emphasis added). These cases have limited application to the current case given the Court's dismissal of the trade secret claims. *See, e.g., E.B.N. Enters., Inc. v. C.L. Creative Images, Inc.* No. 09-CV-06279, 2011 WL 1131313 at *3 (N.D. Ill. Mar. 28, 2011) (finding no presumption of irreparable injury from a breach of a non-competition agreement because the plaintiff made no showing of the defendant's use of "proprietary or unique elements of the plaintiffs' business") (internal citations omitted).

PCA contends that a legal remedy would be inadequate because quantifying damages in this case would be difficult. *See, e.g., Turnell v. CentiMark Corp.*, 796 F.3d 656, 667 (7th Cir. 2015) (determining that "restrictive covenants [are] prime candidates for injunctive relief" when it is difficult to show that an ex-employee has used confidential information); *Mickey's Linen v. Fischer*, No. 17-CV-02154, 2017 WL 3970593 at *18 (N.D. Ill. Sep. 8, 2017) (granting a preliminary injunction in part because it is "impossible to determine at this time the extent to which [the plaintiff's] confidential information will be pirated away by [the defendant] and his new employer") (internal quotations omitted). PCA further alleges that Croner was a valuable employee who helped developed relationships with customers, and that the losses associated with direct competition from him at Welch constitute irreparable harm. PCA's evidence for that harm is somewhat limited, as it is restricted to testimony by Mr. Field at the injunction hearing in which he named a handful of customers from which PCA has allegedly lost business, and Croner's written

testimony indicating which customers he has solicited, both successfully and unsuccessfully, for Welch.

But because the trade secrets claims have been dismissed, the damages resulting from the breach of contract are easily quantifiable. PCA alleges that Croner has breached his contract by earning sales from a relatively small, finite list of customers *See, e.g., McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F.Supp.2d 740, 749 (N.D. Ill. 2010) ("Even assuming [the plaintiff] could prove that it was losing sales [because of the defendant], any such losses could be recovered as money damages from [the defendant] if [the plaintiff] were ultimately to prevail in this action.") The plaintiff, in its motion, even leads with the fact that "PCA has now lost in excess of $6 million in sales." Mot. for Prelim. Inj. at 1. And while "sales" are not the same as "profits," *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 648 n.8 (7th Cir. 2011), courts do not require mathematical precision in determining lost profits, *id.* As the Illinois Supreme Court has stated, "the law does not require that lost profits be proven with absolute certainty. Rather, the evidence need only afford a reasonable basis for the computation of damages which, with a reasonable degree of certainty, can be traced to defendant's wrongful conduct." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 770 N.E.2d 177, 199 (2002). PCA claims longstanding, essentially "permanent," relationships with the customers at issue; this is not a case involving a new business with no established track record. As such, it should be a relatively straightforward process to estimate, by reference to historical data and trends, the amount of lost profit that would have been earned from sales to "PCA" clients who were improperly solicited by Croner. As this Court recently observed in *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 904 (N.D. Ill. 2019):

> Although "[a] plaintiff may suffer irreparable harm if the nature of the loss makes monetary damages difficult to calculate," *E. St. Louis Laborers' Local 100 v. Bellon*

27

*Wrecking & Salvage Co.*, 414 F.3d 700, 705 (7th Cir. 2005), an adequate remedy at law exists when damages can be quantified "to a reasonable, which is not to say a high, degree of precision," *Nicolet Instrument Corp. v. Lindquist & Vennum*, 34 F.3d 453, 456–57 (7th Cir. 1994). How much [plaintiff] suffered in lost profits could likely be quantified to a reasonable level of precision by analyzing profits [plaintiff] lost on any given product as a result of the defendants' use of the information at issue. *See Cullen Elec. Co. v. Cullen*, 218 Ill. App. 3d 726, 161, 578 N.E.2d 1058, 1063 (1991) ("If the loss of future profits is also proved, there is no evidence that these could not be estimated with reasonable certainty by relying on plaintiff's many years of successful operation.").

In the Court's view, then, PCA has not shown that irreparable harm is likely and that the legal remedies available to it are inadequate. For those reasons, the plaintiff's motion for a preliminary injunction is denied.

\* \* \*

In summary, the Court finds that PCA has failed to state a claim with respect to Counts I and III, the DTSA and ITSA claims. Because granting leave to amend would be futile, the Court grants Croner's motion to dismiss, ECF No. 31, with prejudice. With respect to the surviving breach of contract claim (Count II), the Court concludes that although PCA has shown that it has some prospect for success on the merits, it has not shown that it is likely to suffer irreparable harm and that the available legal remedies are inadequate. As a result, PCA's motion for a preliminary injunction, ECF No. 20, is denied. This case is set for status on Wednesday, January 22, 2020 at 9:00 a.m. to discuss a case management schedule with respect to this remaining claim.

Date: January 3, 2020

John J. Tharp, Jr.
United States District Judge