IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PACKAGING CORPORATION OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>PATRICK CRONER and WELCH PACKAGING GROUP, INC.<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 19-cv-03286<br><br>Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

Defendant Patrick Croner used to sell corrugated packaging products for Field Packaging Group, LLC ("Field Packaging"), which was acquired by plaintiff Packaging Corporation of America ("PCA"). Croner had an employment agreement with Field Packaging, which, once PCA acquired Field Packaging, became an agreement between Croner and PCA. The agreement prohibited Croner from contacting certain customers if he voluntarily terminated his employment with PCA. After Croner left PCA to work for defendant Welch Packaging Group, Inc. ("Welch"), PCA accused Croner of breaching that contract and Welch of inducing him to do so. Following discovery, the defendants moved for summary judgment, arguing that PCA had failed to show a genuine dispute as to any material fact supporting its claims. For the reasons that follow, this Court disagrees and denies the motion for summary judgment.

## BACKGROUND

PCA, Welch, and Field Packaging have all been, at some point, in the business of selling corrugated packaging products. In 2005, Welch hired Croner as a sales trainee. Pl.'s Resp. Defs.' 56.1 Statement 5 ¶ 14, ECF No. 237. Croner left Welch for Field Packaging in 2007, where he worked as a salesperson. Defs.' Resp. Pl.'s 56.1 Statement 2 ¶ 2, ECF No. 245. When Croner

joined Field Packaging, he signed an employment agreement prohibiting him from contacting or soliciting certain customers for twelve months if he voluntarily terminated his employment with Field Packaging (the "non-solicitation provision"). *Id.* at 2–3 ¶ 4. The agreement contained an exception for "those customers of Employee with whom he had an on-going relationship as of the date he became employed by [Field Packaging]." Pl.'s Resp. Defs.' 56.1 Statement 5–6 ¶ 16. PCA acquired Field Packaging's membership interests in 2011, *id.* at 4 ¶ 12, including Croner's employment agreement. Croner subsequently worked for PCA as a salesperson. *Id.* at 6 ¶ 17.

In 2018, Croner and Welch began discussing the possibility of Croner returning to Welch. Defs.' Resp. Pl.'s 56.1 Statement 4 ¶ 9. Croner disclosed his employment agreement with PCA to Welch. *Id.* at 4–5 ¶ 10. In May 2019, Croner returned to Welch, voluntarily resigning his position at PCA. Pl.'s Resp. Defs.' 56.1 Statement 8 ¶ 25. During his first twelve months at Welch, when the non-solicitation provision was operative, Croner had contact with the following PCA customers: Thermoflex Corp. ("Thermoflex"), Hu-Friedy Manufacturing Co., LLC ("Hu-Friedy"), Glanbia Performance Nutrition, Inc., Luster Products, Inc., Northern Labs, Inc., Panduit Corporation, Sealed Air Corporation, and Turtle Wax. Defs.' Resp. Pl.'s 56.1 Statement 12–20 ¶¶ 31–38. PCA claims it lost profits from each of those customers in the year following Croner's departure from PCA. *Id.*

PCA brought this breach of contract action against Croner shortly after his departure from PCA in May 2019. PCA sought a temporary restraining order against Croner, barring him from contacting or soliciting the customers covered by the employment agreement. Mot. TRO 1, ECF No. 8. This Court granted that motion, ordering the following:

> Defendant Croner is prohibited from directly or indirectly soliciting, servicing, having contact with, or diverting Plaintiff's "Restricted Customers," as that term is defined in Plaintiff's memorandum, except those with whom Mr. Croner had an ongoing relationship

2

> prior to the 24 months preceding his resignation from Plaintiff and those who were customers of both Plaintiff and of Welch Packaging during the 24 months preceding Mr. Croner's resignation from Plaintiff.

Order, ECF No. 13. Neither of the TRO's two exceptions to the customer list are contained in the employment agreement itself.

PCA later amended its complaint to add a claim against Welch for tortious interference with contract, alleging that Welch induced Croner to breach his employment agreement. Following discovery, Welch and Croner moved for summary judgment. The defendants argue that the employment agreement is unenforceable, that Croner never breached the agreement, and that Welch never induced Croner to breach the agreement. Even if there were a breach, defendants maintain, it did not cause PCA any harm. The Court evaluates each of the defendants' arguments below.

## DISCUSSION

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which directs courts to grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of "identify[ing] 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Logan v. Com. Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996) (citation modified) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant has done so, a nonmovant who bears the burden of proof at trial, as PCA does here, must "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). A genuine issue exists when "a reasonable jury could return a verdict for the non-moving party." *Johnson v.*

3

*Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 609 (7th Cir. 2023) (quoting *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022)). Thus, on reviewing a motion for summary judgment, the court views all evidence in the light most favorable to the nonmovant. *Weaver*, 28 F.4th at 820.

I.  **Breach of Contract**

Under Illinois law, a breach of contract claim has four elements. To succeed on their summary judgment motion for the breach of contract claim, the defendants must show that there is no dispute of material fact as to one or more of the following elements: "(1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871, 877 (Ill. 2022). The defendants argue that the plaintiffs have not adduced evidence sufficient to show a genuine issue for trial on the first, third, or fourth elements.[1] Mem. Mot. Summ. J. 4. The Court considers each in turn.

a.  **The Contract's Validity**

To prove a breach of contract claim, a plaintiff must show that the contract is valid and enforceable. The contract at issue in this case is a restrictive covenant contained in the employment agreement between PCA and Croner. The covenant prohibits Croner from soliciting certain PCA customers after terminating his employment with PCA:

> Employee will not for the twelve (12) month period following his termination directly or indirectly solicit, service, have contact with, or divert any entity which is, as of the time of the termination of Employee's employment or the immediate twenty-four (24) month period prior to such termination, a customer of the Company or prospective customer with whom Employee had prior dealings or who were customers of the Company about whom Employee

---

[1] The parties do not dispute that the plaintiff rendered substantial performance of its obligations under the employment contract.

>learned as a result of his employment or through confidential, proprietary or trade secret information of the Company.

Resp. Mem. 4, ECF No. 236. In Illinois, a restrictive covenant must be reasonable to be enforceable, and a covenant is considered reasonable if it: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). The Illinois Supreme Court called this a "three-dimensional rule of reason." *Id.* at 397.

The defendants focus on the rule of reason's first prong, arguing that the covenant is unenforceable because PCA's relationships with its customers are not legitimate business interests. The defendants maintain that customer relationships are not generally legitimate interests, but that there is an exception for near-permanent relationships. Mem. Mot. Summ. J. 5. That may have been true in the past, *see Instrumentalist Co. v. Band, Inc.*, 480 N.E.2d 1273, 1279 (Ill. Ct. App. 1985), but no longer. That's because *Reliable Fire* is clear: "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case," and near-permanence is not dispositive. 965 N.E.2d at 403. There is no one test for determining whether a legitimate business interest exists; rather, courts should consider the facts of each case, including "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* Indeed, this Court has noted that while Illinois law provides "factors to be considered and not hard-and-fast rules, the guiding principle is that 'a company has a legitimate interest in protecting its information and its customer relationships, which grow and gain value over time.'" *Aon PLC v. Alliant Ins. Servs., Inc.*, 2023 WL 3914886, at *7 (N.D. Ill. June 9, 2023) (quoting *Aon plc v. Alpine Rewards, LLC*, 2023 WL 3713987, at *6 (N.D. Ill. Apr. 12, 2023)).

Illinois law holds that "the enforceability of a restrictive covenant is a question of law." *Reliable Fire*, 965 N.E.2d at 396. However, because that question relies so heavily on the facts of each case, any dispute over facts material to this question forecloses summary judgment. *See Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002) ("[A] mixed question of law and fact . . . may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion—but not otherwise." (citation modified)). A review of the parties' statements of material facts reveals numerous disputed factual issues relevant to whether PCA has a legitimate business interest in its customer relationships. Perhaps due to the defendants' framing of the case law, however, the parties' discussion focuses on the "near-permanent" consideration. When addressing whether customer relationships are near-permanent, Illinois courts have considered the following factors:

> (1) the length of time required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customer's association with the employer; and (7) the continuity of the employer-customer relationships.

*Audio Props., Inc. v. Kovach*, 655 N.E.2d 1034, 1037 (Ill. App. Ct. 1995). Though courts developed this list before *Reliable Fire*, it is nonetheless instructive to this Court's analysis. The parties dispute the following facts relevant to those factors: why customers choose one supplier over another, Pl.'s Resp. Defs.' 56.1 Statement 3 ¶ 9, whether suppliers compete on shipping costs, *id.* at 2 ¶ 7, why customers might order less product than usual from PCA, *id.* at 3 ¶ 8, what keeps customers satisfied, Defs.' Resp. Pl.'s 56.1 Statement 10 ¶ 25, how many customers stay with PCA and for how long, *id.* at 10 ¶ 27, and how customers responded to PCA price increases, *id.* at 21 ¶ 43. The answers to those questions bear on whether PCA's customer relationships were near-

6

permanent. And because near-permanence is one of the things courts consider when determining if an agreement is valid, these factual disputes foreclose a decision at the summary judgment stage on the covenant's enforceability.

### b. Breach

The defendants additionally argue that there is no evidence Croner breached his contract with PCA. Both parties agree that when Croner went to work for Welch, he contacted some of the customers he had worked with at PCA. Defs.' Resp. Pl.'s 56.1 Statement 8 ¶ 20. Both parties additionally agree that PCA's breach of contract claim is now limited to eight of those customers. Mem. Mot. Summ. J. 9. The remaining question is whether any of those eight customers fall within exceptions to the contract's non-solicitation provision.

In support of their motion for summary judgment, the defendants contend that each of the customers at issue were covered by an exception to the covenant—meaning Croner did not breach the contract by contacting them. *Id.* at 8–17. The defendants point to three exceptions that supposedly exist: one that exists in the text of the contract itself, and two in this Court's temporary restraining order. *Id.* at 9–10.

As an initial matter, the Court considers an issue not mentioned in the parties' briefs: whether the exceptions in the TRO are even relevant to PCA's breach of contract claim. It is true that the TRO contained exceptions for those customers "with whom Mr. Croner had an ongoing relationship prior to the 24 months preceding his resignation from Plaintiff and those who were customers of both Plaintiff and of Welch Packaging during the 24 months preceding Mr. Croner's resignation from Plaintiff," Order, ECF No. 13. But neither of those exceptions are included in the contract. The TRO did not rewrite the contract; as inherently preliminary and temporary injunctive

relief, it could not have altered the contract's terms. The TRO told Croner what he could ***not*** do, not what he could. As this Court explained in a February 7, 2020 hearing:

> The TRO did not affirmatively authorize any conduct. It restrict -- it provided certain restrictions on Mr. Croner's conduct. It did not authorize conduct in any way. If Mr. Croner was in conformance with the TRO, that's as much as the TRO required. That doesn't necessarily answer the question of whether he was in violation of the restrictive covenant.

Tr. Proceedings Feb. 7, 2020, at 3–4, ECF No. 109. As such, the exceptions in the TRO are irrelevant to the question of whether Croner breached the contract.

The only relevant exception is the one in the contract itself, which excludes "those customers of Employee with whom he had an on-going relationship as of the date he became employed by Company." Mem. Mot. Summ. J. 9. The defendants argue that six of the eight relevant customers are covered by that exception: Glanbia Performance Nutrition, Inc., Luster Products, Inc., Northern Labs, Inc., Panduit Corporation, Sealed Air Corporation, and Turtle Wax, Inc. Mem. Mot. Summ. J. 9, 12. PCA argues that this exception "can only apply to established customer relationships that he brought with him to PCA" at the time he joined PCA, which excludes the above six customers. Resp. Mem. 12, 15. PCA maintains that if Croner never brought those customers to PCA, or only brought them to PCA after working at PCA for a protracted period, then those relationships were not really ongoing. *Id.* Instead, Croner really "developed those accounts at PCA." *Id.* In response, the defendants argue that to interpret the covenant that way would be to rewrite it, because it does not contain language to that effect. Reply 8, ECF No. 244.

There are two possible ways to interpret PCA's argument: either PCA asks this Court to interpret the contract such that "on-going" refers only to relationships that Croner brought with him to PCA, or to recognize that a reasonable jury could infer from the fact that the customers did

8

not immediately follow Croner to PCA that those relationships were not truly ongoing. The first argument fails. Contract interpretation is a question of law. *Gallagher v. Lenart*, 874 N.E.2d 43, 50 (Ill. 2007). When interpreting a contract, a court must attempt to "give effect to the intent of the parties." *Id.* at 58. Moreover, "[a] court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* The covenant excludes from the non-solicitation provision those customers with whom Croner "had an on-going relationship as of the date he became employed" by PCA. The plain and ordinary meaning of this clause is that it covers the customers with whom Croner already had a working relationship on the date he began working for PCA, regardless of whether he brought them to PCA in a certain time frame. The words "as of the date he became employed" belie a reading that requires looking to what happened *after* that date. This Court will not read in a requirement that contravenes the covenant's plain meaning.

The second argument, however, is more persuasive. On that view, this dispute is not really one of contract interpretation, but one of fact. PCA is entitled, as the nonmovant, to have all reasonable inferences drawn in its favor. Alone, the fact that Croner did not bring his customers immediately with him to PCA may not be enough to infer that his relationships weren't ongoing, but there are other facts in the record that further support that inference. For example, PCA maintains that certain Welch sales to those customers are not credited to Croner and that another Welch agent actually owned some of those accounts. Pl.'s Resp. Defs.' 56.1 Statement 22–23 ¶ 47, 26–27 ¶ 53, 28 ¶ 55, 29–30 ¶ 57, 32–33 ¶ 62, 43–45 ¶ 77. Questions of material fact therefore exist as to whether Croner had an ongoing relationship with these six customers on the date he became employed by PCA.

Two customers remain: Hu-Friedy and Thermoflex. Mem. Mot. Summ. J. 9, 12. The defendants do not argue that Hu-Friedy or Thermoflex are covered by the exception discussed above. And there is enough evidence in the record for a reasonable jury to find that Croner contacted those customers in violation of the covenant. The record reflects that Croner communicated with Hu-Friedy and Thermoflex representatives via email on multiple occasions after moving from PCA to Welch. Defs.' Resp. Pl.'s 56.1 Statement 12–13 ¶ 31, 20 ¶ 38.

There is sufficient evidence in the record for a reasonable jury to find that Croner breached his contract with PCA as to each of the eight customers at issue. As such, the defendants' summary judgment fails for this reason as well.

### c. Causation

The final disputed element is causation. The defendants claim that PCA put forth "no evidence that demonstrates, or even suggests" that Croner or Welch caused PCA damages. Mem. Mot. Summ. J. 18. PCA's expert, defendants point out, assumed causation. *Id.* The defendants further argue that the evidence in the record shows that many of the eight customers left PCA for reasons that had nothing to do with Croner. *Id.* at 18–21.

A plaintiff can show causation either by demonstrating that but for the defendant's breach, the damages would not have occurred, or, if there are multiple potential causes, that the defendant's breach "was a material element and a substantial factor in bringing about the injury." *Young v. Bryco Arms*, 821 N.E.2d 1078, 1086 (Ill. 2004); *In re Emerald Casino, Inc.*, 867 F.3d 743, 755 (7th Cir. 2017). Assuming for purposes of this discussion that Croner did breach the contract, the following disputed facts could support the conclusion that the breach caused PCA's damages—none of which relies on PCA's expert. First, PCA points to thousands of dollars in lost profits from those eight customers after Croner went to Welch. Defs.' Resp. Pl.'s 56.1 Statement 9 ¶ 23. PCA

also points to evidence that its long-term customers stay with PCA for years and rarely leave. *Id.* at 10 ¶ 27. Moreover, Welch made sales to seven of the eight customers after Croner joined Welch (excluding Hu-Friedy), and PCA lost sales to all eight customers. *Id.* at 12–20 ¶¶ 31–38.

The defendants argue that other factors caused these customers to leave PCA, like PCA's price increases and changes in the customers' own businesses. Mem. Mot. Summ. J. 18–21. But PCA need not eliminate the possibility that other factors played a role; it need only put forth evidence sufficient for a reasonable jury to find that Croner's alleged breach was a substantial factor in customers leaving PCA, which it has done. The only customer for which PCA has not met its burden of production is Hu-Friedy. Because Hu-Friedy has never been a Welch customer, Pl.'s Resp. Defs.' 56.1 Statement 21 ¶ 44, it is hard to see how any breach on Croner's part could have caused Hu-Friedy to order less from PCA. As such, no reasonable jury could find that a breach damaged PCA with respect to its Hu-Friedy sales.

Because there are issues of material fact as to each element of PCA's breach of contract claim for seven of the eight customers at issue, the defendants' summary judgment motion fails for this reason as well.

## II. Tortious Interference with Contract

PCA also brought a claim against Welch for tortious interference with contract, alleging that Welch induced Croner to breach his contract with PCA. The elements for tortious interference with contract in Illinois are as follows: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018). As discussed above, there are questions of material fact as to the first and fifth elements. Furthermore, the defendants do not contest the second

11

element. Mem. Mot. Summ. J. 22. The defendants do, however, argue that there is insufficient evidence to support an inference that Welch induced Croner to breach the contract or that Welch caused any breach. *Id.* The Court addresses each argument in turn.

### a. Inducement

A defendant induces a party to breach a contract by engaging in "active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 718 (N.D. Ill. 2017) (quoting *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 802 (N.D. Ill. 2011)). The defendants claim that there is no evidence that Welch induced Croner to breach; if anything, they say, Welch encouraged Croner to adhere to the contract's terms. Mem. Mot. Summ. J. 22–24. Welch's actions, say the defendants, were legitimate business decisions that had nothing to do with poaching PCA's clients. Reply 14–15.

PCA disagrees, pointing first to the testimony of Scott Welch (Welch's CEO). Mr. Welch testified that he told Croner to contact his PCA accounts. Resp. Mem. 24. While Mr. Welch testified he only told Croner to contact his clients to inform them Croner was moving to Welch, Defs.' Resp. Pl.'s 56.1 Statement 8 ¶ 20, his true motivations are a disputed factual issue for the jury to decide. PCA, for example, refers to evidence that Croner asked for equity in Welch to give his PCA customers a reason for leaving, and that Welch discussed Croner's "mix of products and volume" when hiring him. Resp. Mem. 24. Additionally, Croner's employment agreement with Welch indicates both parties believed the covenant was unenforceable. *Id.* at 24–25. On the basis of this evidence, a reasonable jury might infer that Welch hired Croner because of Welch's customer relationships and that Welch induced Croner to solicit those customers.

      **b. Causation**

The defendants also argue that PCA cannot show that any wrongful conduct on Welch's part caused Croner's alleged breach. Mem. Mot. Summ. J. 24. Their only argument to this effect is that there is no evidence Welch asked Croner to breach in the first place. But as discussed above, a reasonable jury could find inducement. Assuming for purposes of this discussion that Welch did indeed induce Croner to breach, a reasonable jury could infer that the inducement caused the breach.

Because there is a genuine issue for trial on each of the elements for PCA's tortious interference with contract claim, the defendants are not entitled to summary judgment on this claim.

                \*      \*      \*

There is, then, sufficient evidence in the record to create a genuine dispute of material fact on PCA's breach of contract and tortious interference with contract claims. On PCA's breach of contract claim, the contract's validity hinges on factual disputes regarding whether PCA's customers were near-permanent—questions this Court cannot resolve on the present record at the summary judgment stage. Moreover, a reasonable jury could find that Croner breached his contract by soliciting PCA's customers, causing PCA damage when those customers ordered less from PCA. On the tortious interference with contract claim, a reasonable jury could find that Welch induced Croner to breach the contract, harming PCA. The foregoing disputes of material fact preclude summary judgment for the defendants.

Date: January 13, 2026

                                                  John J. Tharp, Jr.
                                                  United States District Judge